IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 01, 2014

**IN RE J.C.B.**

**Appeal from the Juvenile Court for White County**
**No. JV514     Sammie E. Benningfield, Jr., Judge**

**No. M2014-01112-COA-R3-PT - Filed November 17, 2014**

This appeal arises from a decision by the Juvenile Court for White County terminating Mother's parental rights to her son.  Child was placed into emergency custody by the Tennessee Department of Children's Services ("DCS" or "the Department"), pursuant to Tenn. Code Ann. § 37-1-113, when he was two months old after law enforcement officials found a methamphetamine lab in the living room of Mother's apartment while Child and Father were present.  The juvenile court issued a protective custody order and appointed a guardian ad litem for Child.  Between that time and the termination hearing, three permanency plans were created.  Mother was incarcerated multiple times and failed to complete any of the requirements of her permanency plans.  DCS tried to schedule visitation for Mother, provide her information about rehabilitation programs, keep in contact with her, and administer drug screens, but it had difficulty due to Mother's repeated incarcerations and failure to keep in contact with DCS.  DCS filed a petition to terminate Mother's parental rights.  The court terminated Mother's parental rights; held that the requirements of the permanency plans were all reasonable; and held that DCS made reasonable efforts to assist Mother in complying with the requirements of the plans.  We affirm the decision of the juvenile court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed**

ANDY D. BENNETT, J., delivered the opinion of the court, in which RICHARD H. DINKINS, and W. NEAL MCBRAYER, JJ., joined.

Laurie A. Seber, Cookeville, Tennessee, for the appellant, Casey R.

Robert E. Cooper, Jr., Attorney General and Reporter, and Ryan A. Lee, Assistant Attorney

General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

BACKGROUND

J.C.B. ("Child") was born in 2012 to Casey R. ("Mother") and Justin B. ("Father").[1] DCS first became involved with Child on November 13, 2012, when law enforcement officials discovered a methamphetamine lab in the living room of Mother's apartment while attempting to serve an outstanding warrant on someone who was present in her home.

Mother, Father, and Child were all present, along with four other people. At that time, Mother submitted to two urine drug screens which both came back positive for methamphetamine, amphetamine, benzodiazepine, and THC.[2] Child was then placed into emergency custody pursuant to Tenn. Code Ann. § 37-1-113. DCS filed a petition for dependency and neglect on November 16, 2012, in the Juvenile Court for White County. On that same day, the court issued a protective custody order and appointed a guardian ad litem for Child.

On December 4, 2012, DCS met with Mother and her appointed counsel to develop a permanency plan, which included a number of responsibilities for Mother and Father. These responsibilities included, but were not limited to: being on time for visitation with Child; not using drugs or alcohol; seeking drug treatment; being attentive to Child's needs; providing healthy food, clothing, and shelter for Child; spending quality time with him; reporting history of drug use; not associating with any alcohol or drug abusers; scheduling and attending mental health screenings; maintaining regular contact with DCS; and keeping contact information updated with DCS. The plan listed Rachel Conrad ("Ms. Conrad") as the primary case worker and provided her address and phone number, along with the contact information for her supervisor. The goal of the plan was adoption or returning Child to his parents.

From December 7, 2012, through January 18, 2013, Mother visited Child three times. Ms. Conrad scheduled visits after that and offered transportation, but Mother repeatedly cancelled. Mother was also convicted of theft on March 15, 2013. The majority of her

---

[1] This appeal was only brought on behalf of Mother; Father is not a party.

[2] Mother submitted to the first drug screen, which came back positive for the mentioned substances, but she denied using any of them. A second drug screen was administered at her request. She tested positive for the same substances.

2

sentence was suspended, and she was placed on probation for eleven months and twenty-nine days. On June 3, 2013, Mother participated in creating a second permanency plan that contained the same goals and responsibilities as the first plan. This new plan also listed Ms. Conrad as the primary case worker and provided her phone number. Mother was then incarcerated on July 19, 2013, for violating her probation and, on July 30, 2013, the juvenile court entered an order finding Child to be dependent and neglected.

On August 16, 2013, while Mother was incarcerated, she tested positive for methamphetamine and amphetamine. Mother later sent an application to Angel Ministries rehabilitation program and was accepted in October. As a result, she was granted early release on November 1, 2013, but she violated her probation by refusing to take a drug screen within three days of that release. On December 19, 2013, a third permanency plan was created which stated that the only goal was adoption and that DCS would be filing a petition to terminate Mother's parental rights. This plan contained no action steps for the parents. It required DCS to provide transportation for Child to and from his medical appointments and to keep his parents informed of those appointments. Mother was not present to help create this permanency plan because she could not be located.

On January 2, 2014, Mother requested from Ms. Conrad an application for Blue Monarch, which is a long-term rehabilitation program. Mother told Ms. Conrad to send the application to Father's address, which Ms. Conrad did eleven days later. The materials never reached Mother, so Ms. Conrad mailed them via certified mail one month later, but they were returned to Ms. Conrad. Mother was incarcerated on February 26, 2014, for her August drug charge and subsequent probation violation. Towards the end of May 2014, Mother received and sent out applications for Blue Monarch and the Maranatha House, which is a long-term treatment facility.

On June 11, 2014, the termination proceeding was held. Mother testified that she did not visit Child after January 18, 2013, because she was on the run as a result of her two drug charges and probation violations. She stated that this, along with her inability to consistently have access to a working telephone, was why it was difficult for DCS to contact her, and that she had not completed any of her requirements under the permanency plans despite being aware of her responsibilities.

Mother testified that she did send out applications in an attempt to find work, along with trying to find a rehabilitation program. In addition to Angel Ministries, the Maranatha House, and Blue Monarch, Mother tried to get into Next Door, but she was not accepted because she had not been clean for six months. Out of these four programs, the only one Mother told Ms. Conrad about was Blue Monarch.

3

Mother also testified that she completed a twelve-step program during one period of incarceration, and that she was dependent on Ms. Conrad because it was difficult for her to find information on rehabilitation programs while incarcerated given her lack of access to the internet, phone books, and family. Mother complained to her previous attorney about DCS, but she received no response and did not follow up.

Ms. Conrad filed an affidavit of reasonable efforts on the same day as the termination proceeding. The affidavit included a list of services that were provided to assist in preventing removal and reunifying the family. In her testimony, Ms. Conrad mentioned some of these services, which included multiple offers for transportation to visits and services (which Mother never accepted), access to a telephone, and the contact information for Cumberland Plateau Recovery A&D Treatment Program ("CPR"). She also provided Mother the contact information for the Choices Program on multiple occasions. However, Ms. Conrad had difficulty keeping up with Mother's addresses and phone numbers because Mother would either not provide an address when requested or would provide addresses that were seemingly incorrect. Ms. Conrad also testified that her inability to maintain contact with the parents and their lack of cooperation made it difficult for her to test them for drugs frequently. However, Ms. Conrad was able to visit Mother while Mother was incarcerated. Ms. Conrad visited Mother four times between July 19 and November 1, 2013, and three times between March 11 and May 28, 2014.

Ms. Conrad testified that Child has been in foster care for over a year and was doing very well. He had a strong bond with his foster parents, who were willing and able to adopt him. Child's foster mother testified that he has been living with her for more than nineteen months and that Child sees a speech therapist and an OT therapist once a week. Child also regularly visits his primary care physician and the Center for Child Development at Vanderbilt.

The juvenile court terminated Mother's parental rights by order entered June 11, 2014. The court found DCS had proven by clear and convincing evidence that termination was in the best interest of Child and that grounds for termination of Mother's parental rights existed. The court primarily based its opinion on Tenn. Code Ann. § 36-1-113(g)(1) and § 36-1-102(1)(A)(iv), which defines abandonment, and stated that Mother's willful failure to support or visit Child despite her ability to do so constituted grounds for terminating her parental rights. The court also stated that Mother's behavior in continuing to use drugs and commit crimes, in addition to allowing Child to be present in a place where methamphetamine was being created, exhibited wanton disregard for Child's welfare. Finally, the court found that the requirements of the permanency plans were all reasonable, and that DCS made reasonable efforts to assist Mother in complying with the requirements of the plans. Mother appeals.

4

The only issue before this Court is whether the trial court erred in finding that DCS made reasonable efforts to reunify Mother with Child before terminating her parental rights. The fundamental nature of parental rights and the severe consequences of their termination require a higher standard of proof in deciding termination cases. *In re Serenity B.*, No. M2013-02685-COA-R3-PT, 2014 WL 2168553, at *2 (Tenn. Ct. App. May 21, 2014). To terminate parental rights, the trial court must find by clear and convincing evidence that at least one of the statutory grounds for termination exists, and that termination is in the child's best interest. *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006). "Clear and convincing evidence 'establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *In re Serenity B.*, 2014 WL 2168553, at *2 (quoting *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004)).

Due to the heightened standard, this Court must review the trial court's factual findings de novo with a presumption of correctness, unless the evidence preponderates to the contrary. *Id.*; Tenn. R. App. P. 13(d). Upon reviewing a trial court's decision to terminate parental rights, this Court's duty is to "determine whether the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish the elements necessary to terminate parental rights." *In re Serenity B.*, 2014 WL 2168553, at *2.

ANALYSIS

Mother makes the following four claims to argue that the trial court erred in terminating her rights: (1) DCS failed to prove the reasonableness of its efforts in its affidavit of reasonable efforts as required by Tenn. Code Ann. § 37-1-166(c)(3) and (4); (2) DCS failed to establish that all the permanency plans were reasonably related to remedying the conditions that necessitated foster care; (3) DCS failed to prove the reasonableness of its efforts as outlined in case law; and (4) DCS failed to seek a court order relieving it of its duty to make reasonable efforts and was therefore required to continue its efforts until the termination hearing. We will discuss each claim in turn.

I.

Mother's first claim is based on Tenn. Code Ann. § 37-1-166(c)(3) and (4), which provide that:

(c) To enable the court to determine whether [] reasonable efforts have been made, the department, in a written affidavit to the court in each proceeding

5

where the child's placement is at issue, shall answer each of the following questions:

. . . .

(3) What services have been provided to assist the family and the child so as to prevent removal or to reunify the family?; and

(4) Has the department had the opportunity to provide services to the family and the child, and, if not, then what are the specific reasons why services could not have been provided?

Mother argues that the Department's affidavit does not meet the statutory requirements of § 37-1-166(c)(3) because Mother's main issue was her addiction to methamphetamine, and the affidavit does not contain enough entries indicating the Department's efforts to help Mother overcome her addiction. She states that "[o]nly a few of the entries describe the department assisting [Mother]," including providing Mother the assessor's phone number, mailing her an application for Blue Monarch, and giving her the number for the Choices Program.

Mother bases her argument on *In re C.M.M. & S.D.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326 (Tenn. Ct. App. Mar. 9, 2004). In that case, a mother ("M.M.") was trying to retain her parental rights for two of her six children. *Id.* at *1. Despite some effort, M.M. made little progress toward reaching the goals of her permanency plan partly because she missed a number of parenting classes and counseling sessions, in addition to never finding work or suitable housing. *Id.* at *3. As a result, the juvenile court terminated M.M.'s parental rights. *Id.*

On appeal, this Court discussed the statutory requirements of an affidavit of reasonable efforts:

Tenn. Code Ann. § 37-1-166(c)(2) and (3) address the procedure for proving the reasonableness of the Department's reunification efforts. The Department must file with the court an affidavit identifying the specific services determined to be necessary to reunite the family, as well as the services that have actually been provided to the parents and the child. The affidavit must also address whether the Department has had a reasonable opportunity to provide the needed services to the family and, if not, the reasons why the services have not been provided. Tenn. Code Ann. § 37-1-166(c)(4).

6

A properly prepared and appropriately detailed affidavit meeting the requirements of Tenn. Code Ann. § 37-1-166(c)(4) should be sufficient to establish the reasonableness of the Department's reunification efforts by clear and convincing evidence. . . . However, if a parent takes issue with the adequacy of the Department's efforts, the Department may be required to put on evidence other than the affidavit regarding its efforts and to make its employees and contractors involved in these efforts available for cross-examination at trial.

*Id.* at \*8 (footnote omitted).

Ultimately, the court held that the record did not contain clear and convincing evidence that DCS made reasonable efforts to reunite M.M. with her children. *Id.* at \*1. The court based its decision partly on the fact that the affidavit of reasonable efforts only listed the services provided directly to the family *before* the children were removed from their home, and these services were described "in the most general terms." *Id.* at \*9.

Here, unlike in *C.M.M.*, the Department's affidavit contains eleven pages that list all of the services provided to Mother and the dates they were provided. Each entry identifies what the services were, and the affidavit lists the services that were provided up until two weeks before the termination hearing, not just prior to Child's removal. A number of these services were aimed at addressing Mother's drug problem, including trying to get in touch with Mother to administer drug screens and trying to provide Mother the contact information for Blue Monarch, CPR, and Choices. Other services included supervising and setting up visits, in addition to meeting with Mother to discuss the circumstances of her situation and the requirements of her permanency plans. Therefore, we believe that the affidavit satisfies the requirements of § 37-1-166(c)(3).

Mother also argues that DCS failed to comply with § 37-1-166(c)(4) by not providing services to the family and not providing a more detailed explanation in its affidavit. The relevant portion of the affidavit states as follows:

Has the Tennessee Department of Children's Services had the opportunity to provide services to the family and child and, if no, then what are specific reasons why services could not have been provided?

Due to the emergent nature of the removal, services could not be provided to the family.

The explanation seemingly contradicts the fact that DCS *did* provide services to the

7

family, as evidenced by the portion of the affidavit that describes all the services provided, as well as Ms. Conrad's testimony at trial that explained all of the Department's efforts. However, because the explanation specifically mentions the emergent nature *of the removal*, we believe it was not meant to suggest that no services had ever been provided, but rather was intended to address why no services were provided *prior to Child's removal*.[3] Because DCS did provide services, there was no need to provide any explanation, as required by § 37-1-166(c)(4). As a result, Mother's argument fails.

## II.

Mother's second claim is that DCS did not make the necessary reasonable efforts because the trial court did not find that the terms of the first permanency plan were reasonable and related to fixing the conditions that made foster care a necessity.[4] Mother specified that she is not appealing the permanency plan itself, but she is only arguing that the trial court did not make the necessary findings in regard to the first plan.

"A trial court must find that the requirements of a permanency plan are 'reasonable and related to remedying the conditions which necessitate foster care placement.'" *In re Valentine*, 79 S.W.3d 539, 547 (Tenn. 2002) (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). This finding "must be made in conjunction with the determination of substantial noncompliance under § 36-1-113(g)(2)."[5] *Id.*

The ratification order for the first permanency plan is not in the record. However, in

---

[3] Pursuant to Tenn. Code Ann. § 37-1-113, the emergent nature of Child's removal justified the lack of services prior to the removal.

[4] The ratification orders for the second and third plans did include this finding and are in the record, but the record does not contain any ratification order for the first plan.

[5] Tennessee Code Annotated section 36-1-113(g)(2) authorizes termination of parental rights when "[t]here has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Tenn. Code Ann. § 37-2-403(a)(2)(C) provides:

> Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement.

the trial court's final decree, the court stated that "[t]he requirements in the permanency plans are all reasonably related to remedying the conditions that necessitate foster care." The court made this finding in conjunction with its finding that Mother "has not substantially complied with the provisions of the permanency plans and therefore her parental rights should be terminated pursuant to Tenn. Code Ann. § 36-1-113(g)(2)." The court also stated that, in the ratification order for the first permanency plan, it *did* find that it was reasonable and related to the conditions that made foster care a necessity. Therefore, Mother's argument fails because the trial court made the necessary findings in regard to the first permanency plan.

III.

Mother's third argument is that DCS failed to prove the reasonableness of its efforts as required by case law. Before a child can be committed to or retained in the custody of DCS, a court must first determine whether reasonable efforts have been made by DCS to prevent the removal of a child from his or her family or to make it possible for a child to return home. Tenn. Code Ann. § 37-1-166(a)(1), (2). The Department's efforts will be deemed reasonable if DCS "has exercised 'reasonable care and diligence . . . to provide services related to meeting the needs of the child and the family.'" *In re Tiffany B.*, 228 S.W.3d 148, 158 (Tenn. Ct. App. 2007) (quoting Tenn. Code Ann. § 37-1-166(g)(1)). The Department's efforts need not be "herculean," but they must include more than just giving the parents a list of service providers and leaving the parents to obtain the services on their own. *Id.*

However, "[r]eunification of a family . . . is a two-way street, and neither law nor policy requires the Department to accomplish reunification on its own without the assistance of the parents." *Id.* at 159. Once services have been made available to them, parents are responsible for making reasonable efforts to rehabilitate themselves. *Id.* For example, Tennessee courts have held that challenges to the efforts of DCS are without merit when the parents have refused contact with DCS and thwarted the Department's attempts to help. *See In re Leland C.L.*, No. E2012-00031-COA-R3-PT, 2012 WL 6562158, at *7 (Tenn. Ct. App. Dec. 17, 2012) (stating that the Department's efforts were futile when father did not contact DCS or visit his child because he was on the run in light of recent criminal charges); *In re Zeylon T.S.*, No. E2011-00287-COA-R3-PT, 2011 WL 5052957, at *10 (Tenn. Ct. App. Oct. 24, 2011) ("DCS cannot be expected to work miracles in the face of . . . dogged resistance to being assisted.").

Ultimately, the reasonableness of the Department's efforts depends on the circumstances of each case, and courts often rely on seven factors, among others, to make this determination. *Tiffany B.*, 228 S.W.3d at 158-59. These factors are:

(1) the reasons for separating the parents from their children, (2) the parents' physical and mental abilities, (3) the resources available to the parents, (4) the parents' efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parents' efforts to address the problems that caused the children's removal, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*Id.* (footnote omitted).

Consideration of these seven factors does not weigh in Mother's favor. (1) Mother is correct that Child was removed from his home due to Mother's drug use. But, (2) Mother is a 21-year-old adult who chose to use drugs, and there is no evidence to suggest that she has any physical or mental disabilities. She testified that she knew of the responsibilities she had under the permanency plans, but she still chose to miss her meetings and not visit her child out of fear of being arrested.

(3) Although Mother had limited resources at her disposal, this was largely the result of her incarcerations, which were the result of criminal actions she chose to engage in. "[S]elf-created legal problems do not constitute an excuse for failing to visit one's child, and similarly, should not create a legal basis for failure to comply with the requirements of a permanency plan." *In re Leland C.L.*, 2012 WL 6562158, at *8. In addition, Ms. Conrad scheduled visits for Mother and offered Mother access to a telephone as well as transportation. So, despite her incarcerations, Mother had enough resources at least to visit her child and make significantly greater progress toward completing the requirements of her permanency plans.

(4) Mother did attempt to get into long term treatment and find work, but those are the only steps of her permanency plans that she came close to completing. She only visited Child three times, continued to use drugs, failed to stay in contact with DCS or provide accurate information, and was not attentive to Child's needs. She also testified that she has not tried as hard as she should have to complete the requirements of her plans.

(5) DCS tried to use various resources to schedule visits for Mother and provide her transportation to those visits. Mother argues that DCS focused too much on visitation and not enough on Mother's drug problem. However, DCS also provided Mother with information regarding the Choices Program and CPR, and it tried to provide her with the information about Blue Monarch. Mother thwarted the efforts of DCS by providing incorrect contact information, failing to stay in contact with DCS, and failing to keep DCS informed

10

regarding the treatment facilities she contacted. "DCS cannot be expected to work miracles in the face of . . . dogged resistance to being assisted." *Zeylon*, 2011 WL 5052957, at *10.

Mother argues that DCS should have researched and found drug treatment facilities, contacted them, coordinated Mother's transfer, paid for the treatment if necessary, and obtained and filled out the necessary applications, in addition to other requirements aimed at providing Mother with treatment. These "herculean" efforts are not required of DCS; it is only the Department's responsibility to make services available to Mother. *Tiffany B.*, 228 S.W.3d at 158. She must make reasonable efforts to rehabilitate herself. *Id.* at 159.

(6) Mother admits that the duration of her remedial efforts was short due to her incarcerations, and (7) there *is* a close fit between the condition that led to Child's separation (Mother's drug use), the permanency plans, and the Department's efforts. The permanency plans were aimed at solving Mother's drug problem by requiring her to stop using drugs, obtain treatment, report her history of drug use, stop associating with people who use drugs, and undergo drug screens. DCS tried to help Mother's drug addiction by giving Mother information for Blue Monarch, CPR, and the Choices Program, and by scheduling drug screens, but Mother's lack of contact and repeated incarcerations made it difficult for DCS to help.

Mother compares this case to *Tiffany B.*, in which both parents of a six-year-old girl had their parental rights terminated. *Tiffany B.*, 228 S.W.3d at 150. Both parents in *Tiffany B.* had drug addictions, did not comply with their permanency plans, were incarcerated multiple times, and failed to visit their child. *Id.* at 153. DCS had difficulty reaching the parents, but DCS also only met with the parents once in 2005, while they were incarcerated, and the parents claimed that DCS knew they could be reached through the child's grandparents. *Id.* DCS claimed that the lack of communication was due to the parents being "on the run," but the only evidence in support of this was the father's testimony that they were "on the go" because they were trying to find work and a place to stay. *Id.* at 160 n.20.

The *Tiffany B.* court held that DCS did not put forth reasonable effort because DCS seemingly intended for the parents to initiate remedial efforts on their own. *Id.* at 159-60. The court found this unreasonable in light of the parents' drug addictions and periods of incarceration. *Id.* at 160. The court also primarily based its decision on the fact that the record contained no evidence of any attempts by DCS to contact the parents between October 6, 2004 (when their child was removed) and May 2005 (when the third case manager was assigned to the case). *Id.* The only contact after that consisted of two visits while they were incarcerated, one telephone conversation, and some contact with the mother's father. *Id.*

This Court believes that *Leland* is more similar to the case at hand. In *Leland*, a father

11

lost the parental rights to his child and challenged the efforts of DCS. *Leland*, 2012 WL 6562158, at *1. In the permanency plan that DCS created for him, some of the father's responsibilities included visiting his Child, undergoing drug tests, finding suitable housing and work, and keeping in contact with DCS. *Id.* However, the father failed to complete any of the requirements of his permanency plan even though he knew what was required of him. *Id.* at *3. He only visited his child once, failed a subsequent drug test, and was arrested multiple times after the permanency plan was created. *Id.* at *2-3. His case manager gave him contact information for DCS and the Child Support Office, but most of the time she had difficulty contacting him by phone and mail. *Id.* at *2. The father testified that his failure to stay in contact with his case manager, as well as his failure to visit his child, was largely due to the fact that he was on the run in light of his criminal charges and his fear of being arrested. *Id.* at *3. The court held that DCS made reasonable efforts by providing the father with a reasonable permanency plan and information for various resources, and that the father's challenge had no merit because he willfully thwarted the efforts of DCS. *Id.* at *8.

This case and *Leland* differ significantly from *Tiffany B*. Both Mother and the father in *Leland* admitted that they were actually "on the run" in light of their criminal charges, which was why they missed meetings and avoided contact with DCS. They both knew their responsibilities under their respective permanency plans but failed to complete any of them. In addition, the case workers from this case and *Leland* tried, unsuccessfully, to mail information to the parents and provide contact information for other resources.

Finally, in *Tiffany B*., the court primarily based its opinion, reversing the trial court's termination, on the Department's failure to prove more than just a few attempts at contacting the parents. *Tiffany B*., 228 S.W.3d at 159-60. Here, Ms. Conrad tried to contact Mother repeatedly; she called jails to see if Mother was incarcerated; she tried to contact Child's grandmother; she contacted Mother's probation officer; and she visited Mother multiple times while she was incarcerated. Ms. Conrad also set up visits for Mother and provided Mother with contact information for different resources. Ms. Conrad provided Mother access to a telephone and offered her transportation to visit Child as well. As previously noted, the Department's efforts need not be "herculean," and parents must also make reasonable efforts to rehabilitate themselves. *Tiffany B*., 228 S.W.3d at 158- 59. Mother voluntarily engaged in conduct that led to her incarceration and thwarted the efforts of Ms. Conrad. When considering these factors alongside the case law, we believe the efforts of Ms. Conrad and DCS were reasonable.

IV.

Mother's final argument is that, by not seeking a court order, DCS was required to continue making reasonable efforts until the termination hearing. Mother bases her argument

on *In re B.L.C.*, No. M2007-01011-COA-R3-PT, 2007 WL 4322068 (Tenn. Ct. App. Dec. 6, 2007). In that case, DCS argued it had no duty to continue making reasonable efforts between the time of taking custody of the children and the termination hearing. *Id.* at *10. The court disagreed and made the following statement, which Mother relies upon:

> We believe the most reasonable and natural interpretation of [Tenn. Code Ann. § 37-1-166(g)] is that DCS is relieved of its responsibility to make reasonable efforts to assist in the preservation and reunification of families that the State has decided to separate *at such time* that a court of competent jurisdiction makes the required determination of aggravated circumstances, and not before. Prior to such a determination, DCS must continue to make reasonable efforts. To hold otherwise would be to create an unacceptable level of uncertainty among DCS's staff members as to whether, and when, they are required to exercise reasonable efforts, because the answer to that question would not be clear until a trial court, or possibly an appellate court, rules on the issue of abandonment. A "wrong guess" on DCS's part would create an unacceptably long delay in an area of the law, termination of parental rights, where expediency is of particular importance. We also make this determination mindful of a parent's fundamental constitutional rights in this regard, and the profound, permanent consequences of an order terminating a person's parental rights.

*Id.* at *9. The court went on to state that, "[i]f, in a termination case, DCS believes it appropriate to be relieved of the responsibilities generally placed upon it by Tenn. Code Ann. § 37-1-166, it should petition the trial court for a 'determination' described and required by Tenn. Code Ann. § 37-1-166(g)(4)." *Id.* at *10 (footnote omitted).

In *B.L.C.*, there was a particular point in time when DCS stopped making reasonable efforts: after taking custody of the children. *Id.* Here, Mother does not suggest that there was any particular point in time prior to the termination hearing when DCS stopped making reasonable efforts and would have been required to seek a court order. Rather, she argues that DCS violated the statute by not seeking a court order and failing to put forth enough effort throughout the entire course of this case. As previously discussed, DCS *did* make reasonable efforts throughout this case, and there is no evidence to suggest that there was any point in time prior to the termination hearing when DCS stopped doing so. Ms. Conrad tried to contact Mother and met with her in prison up until two weeks before the termination hearing. For these reasons, Mother's argument fails.

13

CONCLUSION

The judgment of the juvenile court is affirmed.  Costs of appeal are assessed against the appellant, Casey R., for which execution may issue, if necessary.

_____
ANDY D. BENNETT, JUDGE